State ex rel. Utilities Comm. v. Carolina Utility Customers Assoc.

STATE OF NORTH CAROLINA EX REL. UTILITIES COMMISSION, NORTH CAROLINA NATURAL GAS CORPORATION, AND THE PUBLIC STAFF v. CAROLINA UTILITY CUSTOMERS ASSOCIATION, INC., THE ALUMINUM COMPANY OF AMERICA, AND THE CITIES OF WILSON, ROCKY MOUNT, GREENVILLE, AND MONROE, NORTH CAROLINA

No. 467A86

(Filed 6 October 1988)

1. Gas § 1.1— natural gas—different rates for various customer classes

Findings of fact by the Utilities Commission, which were supported by substantial evidence in view of the whole record, supported the Commission's conclusion that different rates of return adopted for the various classes of customers of a natural gas company are just and reasonable and do not unreasonably discriminate among the customer classes. While an assessment of the rates based simply on the cost of service might suggest that the approved rates are unnecessarily discriminatory, the Commission's analysis of the noncost factors permitted in our case law was sufficient to justify the Commission's decision. N.C.G.S. §§ 62-130(a), 62-131(a), 62-133(d) and 62-140(a).

2. Gas § 1.1— natural gas—transportation rates not discriminatory

Rates which allow a natural gas company to earn the same margin of profit for transporting customer owned gas as it earns for transporting gas under a sales contract are not unjust and unreasonably discriminatory.

3. Gas § 1.1— natural gas—Industrial Sales Tracker Formula

A modified Industrial Sales Tracker Formula adopted by the Utilities Commission for a natural gas company does not unreasonably discriminate between customer classes in violation of N.C.G.S. § 62-140(a) and does not result in unjust and unreasonable rates in violation of N.C.G.S. §§ 62-130(a) and 62-131(a).

Justice MEYER dissenting.

APPEAL by the cities of Wilson, Rocky Mount, Greenville, and Monroe (Cities), the Carolina Utility Customers Association, Inc. (CUCA), and the Aluminum Company of America (Alcoa), pursuant to N.C.G.S. § 7A-29(b), from the North Carolina Utilities Commission's (Commission) ORDER ON REMAND (ORDER) entered 31 January 1986 in Docket Nos. G-21, Sub 235 and Sub 237, approving rates and charges for natural gas service provided by North Carolina Natural Gas Corporation (NCNG). Heard in the Supreme Court 11 May 1987.

*McCoy, Weaver, Wiggins, Cleveland & Raper by Donald W. McCoy and Alfred E. Cleveland for North Carolina Natural Gas Corporation, appellee.*

*Robert P. Gruber, Executive Director, by Antoinette R. Wike, Chief Counsel, and Vickie L. Moir, Staff Attorney, for Public Staff—North Carolina Utilities Commission, intervenor appellee.*

*Jerry B. Fruitt for Carolina Utility Customers Association, Inc., defendant appellant.*

*LeBoeuf, Lamb, Leiby & MacRae by Samuel Behrends, IV, for Aluminum Company of America, intervenor appellant.*

*Spiegel & McDiarmid by David R. Straus, Gary J. Newell and Barbara S. Esbin; Poyner & Spruill by J. Phil Carlton for Cities of Wilson, Rocky Mount, Greenville, and Monroe, North Carolina, appellants.*

EXUM, Chief Justice.

This is the second appeal in this general rate case. In the first appeal, *State ex rel. Utilities Comm. v. N.C. Textile Manufacturers Assoc., Inc.*, 313 N.C. 215, 328 S.E. 2d 264 (1985), we remanded the proceeding to the Commission for further findings and for modification consistent with our opinion. From the Commission's subsequent ORDER the questions presented are whether the Commission erred in concluding: (1) the adopted rate of return levels do not unreasonably discriminate between classes of customers; (2) transportation rates that allow for the same margin of profit whether the gas is customer-owned or transported under a sales contract are not excessive and do not unreasonably discriminate; (3) a modified Industrial Sales Tracker Formula (IST) is not unreasonably discriminatory to or within customer classes. We conclude the Commission did not err and affirm its ORDER.

I.

On 27 April 1983 NCNG filed an application with the Commission to adjust certain rates charged for natural gas. The Commission declared the matter a general rate case and combined it with NCNG's 10 June 1983 application for revision of its Transportation Rate Schedule T-1. After conducting hearings, the Commis-

sion issued its order on 6 January 1984 in which it approved a rate increase of $1,117,531, terminated the curtailment tracking rate (CTR), implemented an IST, adopted a revised transportation rate and allowed NCNG to include a portion of its investment in a certain gas pipeline in its rate base.[1] Cities and North Carolina Textile Manufacturers, predecessor to CUCA, appealed. We affirmed the Commission's Order in part, reversed it in part, and remanded the case to the Commission for reconsideration. *Id.* at 230, 328 S.E. 2d at 273. On 31 January 1986 the Commission issued its ORDER from which Cities, CUCA, and Alcoa now appeal.

NCNG provides natural gas to the public under a Certificate of Public Convenience and Necessity issued by the Commission. Wholesale natural gas service is provided to Cities, each of which is authorized under N.C.G.S. §§ 160A-311(4), -312 to own and operate a natural gas distribution system for their respective citizens. The Commission has no authority to regulate rates set by Cities for gas sold by Cities to their respective citizens. NCNG furnishes retail natural gas service in eastern North Carolina to residential, commercial and industrial customers.

NCNG has separate rate schedules for each customer class. These schedules include: Rate Schedule 1—Residential; Rate Schedule 2—Commercial and Small Industrial; Rate Schedules 3A and 3B—Industrial Process Uses; Rate Schedule 4A—Other Commercial and Industrial Non-IST customers; Rate Schedule 4B—Other Commercial and Industrial IST customers; Rate Schedule 5A—Boiler Fuel Non-IST customers; Rate Schedule 5B—Boiler Fuel IST customers; Rate Schedule 6A—Large Boiler Fuel Non-IST customers; Rate Schedule 6B—Large Boiler Fuel IST customers; Rate Schedule RE-1—wholesale service to Cities; Rate Schedule SM-1—Cities negotiated rates for industrials served by Cities; Rate Schedule S-1—NCNG's negotiated rates for industrials served by NCNG; Rate Schedule T-1—transportation rate applicable to boiler fuel industrial volumes; Rate Schedule T-2—transportation rate applicable to non-boiler fuel industrial volumes.

---

1. The legitimacy of this inclusion was resolved in favor of NCNG in the first appeal. *State ex rel. Utilities Comm. v. N.C. Textile Manufacturers Assoc., Inc.,* 313 N.C. at 230, 328 S.E. 2d at 273.

In its original Order the Commission imposed the entire rate increase on customers in Rate Schedules 1 and 2. Notwithstanding this decision not to increase the rates of the other customers, including appellants, the Court on the first appeal noted:

> The evidence before the Commission makes it clear that there is substantial discrimination between the various classes of customers. Residential customers in Rate Schedule No. 1 and commercial and small industrial customers in Rate Schedule No. 2 pay rates which yield a return considerably below the costs incurred by NCNG in serving them. The customers in the remaining rate schedules pay rates which yield returns in excess of their cost of service. The customers in Rate Schedule Nos. 3B, 4, 5 and 6 in particular pay rates which are far in excess of NCNG's cost of serving them. The effect of this rate structure is that the rates of residential, certain commercial and small industrial customers are subsidized by the remaining industrial, wholesale and commercial customers.

*Id.* at 222-23, 328 S.E. 2d at 269. We remanded this aspect of the Commission's first Order, saying:

> In light of the substantial difference between cost of service and rate of return for the various classes of customers, the question of unreasonable discrimination among and within the classes of service is a material issue of fact and of law. The Commission's failure to address this issue in its findings of fact is error prejudicing the substantial rights of defendants. Therefore, the case must be remanded to the Commission so that it may consider this issue and make appropriate findings. N.C. Gen. Stat. §§ 62-79(a) and 62-94(b); *Utilities Commission v. Public Staff,* 309 N.C. at 207-08, 306 S.E. 2d at 442.

*Id.* at 223, 328 S.E. 2d at 269-70. Three other aspects of the Commission's Order were remanded for the Commission's further consideration: (1) the implementation of the IST; (2) the elimination of the CTR and (3) the approval of Transportation Rate T-1.

The Commission on remand conducted further hearings, made additional findings and concluded: (1) the rates it originally approved, including Transportation Rate T-1, did not discriminate

unreasonably among the various classes of NCNG's customers; (2) a modified IST would not operate in an unreasonably discriminatory fashion; and (3) elimination of the CTR did not result in an unjust rate increase.[2]

## II.

[1]   On this second appeal Cities, CUCA, and Alcoa continue to urge that the Commission has not adequately, through appropriate findings supported by evidence, justified the differences in the rates of return on cost of service permitted to NCNG's various customer classes. They argue that without such justification these differences amount to unreasonably discriminatory rates which violate N.C.G.S. § 62-140(a)[3] and unjust and unreasonable rates which violate N.C.G.S. §§ 62-130(a) and 62-131(a).[4] They further argue that the Commission failed to consider all the material facts of record in determining what were just and reasonable rates in violation of N.C.G.S. § 62-133(d).[5] As the Court noted on the first appeal:

2. Eliminating the CTR increased NCNG's revenues by $3,420,423. On the first appeal the Court instructed the Commission on remand to "make findings on whether the increased rates brought about by the termination of the CTR are just and reasonable." *State ex rel. Utilities Comm. v. N.C. Textile Manufacturers Assoc., Inc.*, 313 N.C. at 221-22, 328 S.E. 2d at 268-69. In its ORDER now appealed from the Commission made the necessary findings to support its conclusion that the increase in revenues produced by elimination of the CTR is just and reasonable. No challenge to this conclusion has been raised in this second appeal.

3. This statute provides, in pertinent part:

(a) No public utility shall, as to rates or services, make or grant any unreasonable preference or advantage to any person or subject any person to any unreasonable prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to rates or services either as between localities or as between classes of service.

N.C.G.S. § 62-140(a) (1982 Replacement Volume).

4. These statutes provide: "The Commission shall make, fix, establish or allow just and reasonable rates for all public utilities subject to its jurisdiction. . . ." N.C.G.S. § 62-130(a) (1982 Replacement Volume).

"Every rate made, demanded or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable." N.C.G.S. § 62-131(a) (1982 Replacement Volume).

5. This statute provides: "The Commission shall consider all other material facts of record that will enable it to determine what are reasonable and just rates." N.C.G.S. § 62-133(d) (1982 Replacement Volume).

A substantial difference in service or conditions must exist to justify a difference in rates. *Utilities Comm. v. Edmisten,* 291 N.C. 424, 428, 230 S.E. 2d 647, 650 (1976). "There must be no *unreasonable* discrimination between those receiving the same kind and degree of service." *Utilities Comm. v. Mead Corp.,* 238 N.C. 451, 462, 78 S.E. 2d 290, 298 (1953) (emphasis added). While decisions of the Commission involving the exercise of its discretion in fixing rates are accorded great deference, *see Utilities Comm. v. Edmisten,* 291 N.C. at 428, 230 S.E. 2d at 650; *Utilities Comm. v. Coach Co. and Utilities Comm. v. Greyhound Corp.,* 260 N.C. 43, 54, 132 S.E. 2d 249, 254 (1963), the Commission has no power to authorize rates that result in unreasonable and unjust discrimination. *Utilities Comm. v. Edmisten,* 291 N.C. at 428, 230 S.E. 2d at 650; *Salisbury and Spencer Ry. v. Southern Power Co.,* 180 N.C. 422, 425, 105 S.E. 28, 29-30 (1920).

*State ex rel. Utilities Comm. v. N.C. Textile Manufacturers Assoc., Inc.,* 313 N.C. at 222, 328 S.E. 2d at 269.

The scope of appellate review of a decision by the Commission is provided in N.C.G.S. § 62-94. Under this standard, the reviewing court

(b) . . . may reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:

(1) In violation of constitutional provisions, or

(2) In excess of statutory authority or jurisdiction of the Commission, or

(3) Made upon unlawful proceedings, or

(4) Affected by other errors of law, or

(5) Unsupported by competent, material and substantial evidence, in view of the entire record as submitted, or

(6) Arbitrary or capricious.

N.C.G.S. § 62-94 (Replacement Volume 1982). This Court's statutory function is to assess whether the Commission's order is affected by errors of law, and to determine whether there is sub-

stantial evidence, in view of the entire record, to support the position adopted. *See State ex rel. Utilities Comm. v. Eddleman,* 320 N.C. 344, 355, 358 S.E. 2d 339, 347 (1987); *State ex rel. Utilities Commission v. Carolina Utilities Customers Assoc.,* 314 N.C. 171, 179-80, 333 S.E. 2d 259, 265 (1985).

At the outset we emphasize that the Court on the first appeal of this case did not hold that the differences in rates of return between NCNG's customer classes were unreasonably discriminatory or unjust and unreasonable in violation of these statutes. We held simply that the Commission's findings of fact failed adequately to justify the discrimination.

As the record is now before us the Commission has taken additional evidence and made additional findings in its ORDER. The principal questions are whether the Commission's ORDER now contains findings sufficient to justify its conclusions and whether those findings, are, in turn, supported by evidence in light of the whole record. Appellants continue to argue that the discrimination in the rates of return among NCNG's several customer classes approved by the Commission are not justified by adequate findings supported by the whole record; therefore, by approving them the Commission exceeded its statutory authority. Appellees counter that the evidence and findings adequately justify the approved rates and demonstrate that they do not unreasonably discriminate among NCNG's various classes of customers.

In order properly to address each side's contentions we think it helpful to review what "rates of return" represent and how they are determined for each class of customers.

The "rate of return" is a percentage which the Commission concludes should be earned on the rate base. N.C.G.S. § 62-133(b)(4) (1982 Replacement Volume). The "rate base" is the cost of the utility's property which is used and useful in providing service to the public. N.C.G.S. § 62-133(b)(1) (1982 Replacement Volume). The Commission in its prior Order concluded that NCNG should be allowed to earn a company-wide rate of return of 13.08%, and no appellant has challenged this conclusion in either appeal.

Determining the effective rate of return for a particular NCNG customer class involves a mathematical computation con-

taining several components. The computation must be performed after the fact by utilizing the financial information for a given test year with adjustments made for any subsequent increase in rates. There are in the computation three basic components which must be ascertained. First, an allocation must be made to determine the portion of the total rate base applicable to each customer class. Likewise an allocation, which is in this case the most controversial, must be made to determine the cost of service or operating expenses applicable to each customer class. Finally, the revenues NCNG collected from each customer class for the test period, adjusted for any subsequent increase in rates, must also be determined. Once all of the components have been agreed upon the computation itself is not complicated. The formula for determining the rate of return for each customer class is as follows: Operating revenues less cost of service (operating expenses and taxes) divided by the rate base equals the rate of return. Thus, the rate of return for any particular customer class varies inversely with the amount of the rate base and the amount of the cost of service, and directly with the amount of the revenues, allocated to that customer class.

On remand the Commission reaffirmed its previously approved rate levels. The Commission concluded the "approved rates do not unreasonably discriminate among the various classes of NCNG customers in violation of G.S. 62-140(a)." The Commission was

> of the opinion that the rates previously approved in this proceeding result in a fair distribution of the overall rate increase granted to NCNG among customer classes and that it would be unjust and unreasonable, based upon the evidence presented in this case, to place any greater rate increase on the residential and small industrial customers served by the Company who are already paying and will continue to pay the highest unit price rates on the system.

As the Court noted on the first appeal:

> In determining whether rate differences constitute unreasonable discrimination, a number of factors should be considered: "(1) quantity of use, (2) time of use, (3) manner of service, and (4) costs of rendering the two services." *Utilities Comm. v. Oil Co.*, 302 N.C. 14, 23, 273 S.E. 2d 232, 238 (1980). Other fac-

tors to be considered include "competitive conditions, consumption characteristics of the several classes and the value of service to each class, which is indicated to some extent by the cost of alternate fuels available." *Utilities Comm. v. City of Durham*, 282 N.C. 308, 314-15, 193 S.E. 2d 95, 100 (1972).

*State ex rel. Utilities Comm. v. N.C. Textile Manufacturers Assoc., Inc.*, 313 N.C. at 222, 328 S.E. 2d at 269.

In deciding to reaffirm its previously established rates the Commission gave "careful consideration to, and . . . weighed and balanced all of the relevant factors." The Commission's ultimate conclusion on the discrimination issue is: "It would be unjust and unreasonable to establish rates . . . based upon equalized rates of return for all customer classes." In support of this conclusion the Commission relied upon the following evidence, findings of fact, and conclusions of law:[6]

First, the Commission emphasized "it would be unjust and unreasonable . . . to place any greater rate increase on the residential and small industrial and commercial customers served by the Company who are already paying and will continue to pay the highest unit price rates on the system." The evidence indicated that setting rates entirely in terms of cost of service, as advocated by CUCA, would result in a 32% rate increase to residential customers. Additionally, NCNG witness Gerald A. Teele testified that under CUCA's proposed rates, the residential customers, who comprise about 14% of NCNG's annual sales volume, would be called to pay approximately 46% of NCNG's allowed profit margin. The evidence also demonstrated that the residen-

---

6. In this case as in previous proceedings the Commission's summary of evidence, findings of fact and conclusions of law are mixed together in portions of the record denominated "Findings of Fact" and "Evidence and Conclusions for Findings of Fact." *See State ex rel. Utilities Comm. v. Public Staff*, 322 N.C. 689, 693, 370 S.E. 2d 567, 570 (1988); *State ex rel. Utilities Comm. v. Eddleman*, 320 N.C. at 351-52, 358 S.E. 2d at 345-46. Some of the Commission's so-called "Findings of Fact," including those regarding the reasonableness of the approved rates of return, are actually matters of judgment and are more appropriately denominated conclusions. Throughout this opinion we have tried to distinguish between and denominate findings and conclusions on the basis of the distinctions we drew in *Public Staff* and *Eddleman*. As this Court noted in *State ex rel. Utilities Comm. v. Eddleman*, 320 N.C. at 352, 358 S.E. 2d at 346, "[a]s long as 'each link in the chain of reasoning' appears in the Commission's order, mislabeling is merely an inconvenience to the courts."

State ex rel. Utilities Comm. v. Carolina Utility Customers Assoc.

tial and commercial and small industrial customers absorbed the entirety of the rate increase approved in this proceeding.

Second, the Commission was of the opinion that though cost of service studies are both important and relevant in designing rates, they are highly judgmental and should be considered as only one among many factors. NCNG witness Teele, CUCA witness L. W. Loos, and Cities' witness Fred Saffer prepared and presented the results of several cost of service studies. While these studies all demonstrated that the rates of return for customers in Rate Schedules 1 and 2 are generally below those of other customer classes, each study generated divergent outcomes. The rates of return for customers in Rate Schedules 1 and 2 ranged from − 14.33% to 17.64%. The rates of return for the Cities ranged from 14.12% to 38.49%. The rates of return for the large industrial customers in Rate Schedules 4, 5, and 6 showed the greatest variability. Depending on the methodologies followed and the assumptions used, these rates of return ranged from a low of − 5.34% to a high of 179.95%.

Last, the Commission found that rates of return between NCNG's customers are not directly comparable. The evidence presented indicated that NCNG's residential, industrial, and city customers are not equally situated. Seventy-five percent of industrial customers can negotiate lower gas prices by threatening to switch to alternate fuels. Approximately 35% of the Cities' customers have this fuel switching capacity as well. This ability to negotiate lower rates gives the large industrial and commercial customers of NCNG and Cities a bargaining power unavailable to residential and small commercial customers. Such power renders NCNG's large industrial and commercial customers, and indirectly Cities,[7] risky ratepayers because they can force NCNG to meet competitive costs in order not to lose substantial sales. This risk justifies a higher rate of return relative to residential and small

---

7. Cities' industrial customers with fuel switching capacity are served under Rate Schedule SM-1. Cities negotiate gas prices with these customers and pass the results of their negotiations on to NCNG, which, in turn, adjusts its price to Cities of gas volumes used to serve these customers. The ability of the Cities to negotiate lower prices with these customers in order to retain them also enables the Cities to lower their overall cost of gas from NCNG.

commercial customers who ultimately bear the burden of these negotiated prices through the IST.[8]

In the Commission's ultimate conclusion on the discrimination issue it also stated:

Other relevant factors which must be considered in setting rates in addition to the estimated cost of service include value of service, quantity of natural gas used, the time of use, the manner of use, the equipment which NCNG must provide and maintain in order to meet the requirements of its customers, competitive conditions, and consumption characteristics and other factors . . . .

The Commission's ORDER does not specifically address each of these factors seriatim. The ORDER does, however, set forth evidence, findings of fact, and conclusions of law which demonstrate that the Commission gave consideration to these interrelated factors and their applicability to each customer class. This evidence and findings include the following:

The Commission found that capital costs allocated to the rate bases of industrial customers and Cities were substantially below those of residential and commercial customers. Capital costs allocated to the industrial customers and Cities were incurred by NCNG twenty-five to thirty years ago. Since the residential and commercial customers have substantially more of the most recent capital costs allocated to them, they suffer most of the brunt of the post 1973 inflation in those costs. Cities cogently argue that if, in fact, more expensive capital is properly allocable to residential and commercial customers, they and not Cities ought to pay for it. The Commission nevertheless determined that, capital costs not having been adjusted for inflationary trends, it was not fair to saddle the residential and commercial customers with the entire brunt of this circumstance. The Commission considered this to be a legitimate difference between customers which should be taken into account in setting rates.

With respect to the large industrial customers, the evidence showed that very few of them have long-term contracts, none of them pay demand charges, and very few pay facilities charges.

---

8. The operation of the IST is discussed, *infra*, in section IV.

This, coupled with the ability to switch to alternate fuels, enables these customers to leave NCNG's system at any time without further obligation for the costs incurred in serving them. NCNG, on the other hand, must maintain long-term contracts with its supplier in order to ensure adequacy of service to all customers. The Commission found "NCNG has been transporting lower cost, spot-market gas for many of these customers, thus saving them substantial amounts of money compared to alternative fuel prices. In many instances, NCNG's affiliate acted as agent without charging an agency fee in securing these customers' natural gas requirements . . . ." Additionally, although the large industrial customers are charged a relatively low per unit price for gas, in part as a result of their relatively high priority of service interruption, the evidence was uncontroverted that actual interruptions in service for these customers has been rare. The Commission found that this factor "strongly indicates that . . . industrial customers are served on what amounts to a firm basis and, considering the value of service to these customers, . . . indicates that industrial rates of return . . . should be higher than the system average."

The consumption characteristics of the large industrial customers also played a part in the Commission's decision to elevate the industrial rates of return above the system average. The large volume of gas used by industrial customers requires NCNG to increase its capacity and use compressors in order to provide service without constant interruption. CUCA witness Loos admitted that such extensive service required that NCNG purchase both the quantity of gas, and the equipment necessary, to meet this demand. Yet, as already noted, the majority of large industrial customers pay no demand charges.

With respect to the Cities, the Commission recognized that the manner in which Cities are served separates them from residential and small industrial customers. The wholesale rate to each of the Cities enables them to control entirely the rates they charge their own customers. Additionally, the Cities are free to add new industrial and residential customers at will. Thus, while neither NCNG nor the Commission has any control over how many industrial and residential customers the Cities obtain, NCNG must provide sufficient gas and line capacity to meet the Cities' average and peak demands. Furthermore, Cities witness

Saffer confirmed in testimony that NCNG has cooperated with the Cities in their efforts to expand their systems and retain their own large industrial customers.

According to Public Staff witness Raymond J. Nery, the value of service to Cities is enhanced by the fact that their overall demand rate or load factor for gas is less than 50% of their possible maximum requirement compared with NCNG's system average of 63% in the test year and 71% in fiscal year 1985. NCNG is required, nevertheless, to purchase gas to cover these possible peak day demands which can exceed average daily use of gas by as much as 2½ times. The lower load factor means that the Cities get the benefit of having sufficient gas to meet peak demands without paying added demand charges for periods when they do not require such quantities. According to Nery, if the Cities had to pay demand charges, the increased cost to the Cities would be approximately $446,000. The Commission concluded that all of the preceding factors "point to a higher rate of return requirement for NCNG's sales to Cities."

The evidence supports the Commission's concern that an additional increase in residential and commercial and small industrial rates might cause substantial hardships to these customers. The uncontradicted evidence shows that residential and commercial and small industrial customers pay the highest per unit price of gas on NCNG's system. Though these customers account for only 14% of NCNG's sales volume, they pay 25% of NCNG's margin (revenues less cost of gas and gross receipts tax) under the approved rates. To set rates based entirely on cost of service, as promoted by the appellants, fails to recognize these customers' limited alternatives. We have recently recognized that unforeseen substantial burdens on customers due to a sudden rate increase should be avoided. See State ex rel. Utilities Comm. v. Carolina Utilities Customers Assoc., 314 N.C. at 196, 333 S.E. 2d at 274-75. So too in this case, the Commission reasonably concluded that additional increases in rates of return of residential and commercial and small industrial customers would be unjust at this time.

The evidence regarding the other noncost factors considered by the Commission also serves to justify differing rate of return levels for the individual customer classes. In analyzing and distinguishing the application of these factors to the opposing cus-

tomer classes, the Commission complied with the demands of our case law regarding a decision to set discriminatory rates. The Commission drew legitimate distinctions which justify its decision to maintain industrial and Cities' rates of return at a higher level than residential and commercial and small industrial rates.

Even if "[u]pon the same facts we might have reached a different result," *Utilities Comm. v. Coach Co. and Utilities Comm. v. Greyhound Corp.*, 260 N.C. 43, 54, 132 S.E. 2d 249, 257 (1963), it is not for this Court to reverse or remand the Commission's decision on this account. We are cognizant of the cogent arguments made by appellants that the differences relied on by the Commission in approving NCNG's rate schedules do not justify the discriminations in rates of return so as to make them reasonable discriminations. Appellees argue with equal cogency to the contrary. Both sets of arguments are essentially fact based and are more properly made to the Commission than to this Court. The Commission has, on remand, supported its conclusions on the discrimination issue with evidentially supported factual findings that it has determined in its administrative expertise *do* justify the discriminations it has approved. It is not this Court's duty to evaluate the accuracy of complex statistical models, conflicting methodologies, and the opposing expert opinions drawn therefrom. This, instead, is the duty of the Commission which has the special knowledge, experience and training best suited to make such determinations. *See Utilities Commission v. Champion Papers, Inc.*, 259 N.C. 449, 456, 130 S.E. 2d 890, 895 (1963); *Utilities Comm. v. State and Utilities Comm. v. Telegraph Co.*, 239 N.C. 333, 349, 80 S.E. 2d 133, 144 (1953).

We also note as particularly significant that this proceeding has not resulted in any increase in the rates of the appellants. Only the rates of the residential and commercial and small industrial customers have been increased. Thus, the approved rates at least move in the direction of more nearly equalizing the rates of return among all NCNG's customer classes.

After a careful review of the record we hold the Commission's ORDER does contain findings sufficient to justify its conclusion that the approved rates of return are just and reasonable and do not unreasonably discriminate among the various classes of NCNG customers. Furthermore, the Commission's findings are

supported by substantial evidence in view of the whole record. While an assessment of the Commission's ORDER based simply on the cost of service evidence might suggest the adopted rates are unreasonably discriminatory, the Commission's analysis of the noncost factors permitted in our case law is sufficient to justify the Commission's decision.[9]

### III.

[2] CUCA argues that the Transportation Rates T-1 and T-2 approved by the Commission are unreasonably discriminatory and unjust and unreasonable.

In its original Order the Commission approved transportation rates which enabled NCNG to earn the same profit margin for transporting customer-owned gas as it would have earned for gas sold under a sales rate schedule. Margins allowed under both transportation rates were based on margins allowed under the sales Rate Schedules 4, 5, and 6. In light of our concern over the discrimination present in the sales rate schedules between the various classes of customers and our decision to remand the proceeding so the Commission could consider this issue and make appropriate findings, we also directed the Commission to assess whether the adopted transportation rates were unreasonably discriminatory. We qualified our decision to remand on this issue by stating:

> We do not hold that it is unjust and unreasonable as a matter of law for a utility to earn the same profit margin on transported gas that it earns on its own retail sales of gas. TMA has not indicated that it argued this issue before the

---

9. In the first appeal we instructed the Commission to "decide whether the present rates result in unjust and unreasonable discrimination among ratepayers . . . [and] *[i]f the Commission finds such discrimination to exist, . . . [to] examine the remedies proposed by TMA and Cities and decide if one of those or some other remedy is appropriate."* State ex rel. Utilities Comm. v. N.C. Textile Manufacturers Assoc., Inc., 313 N.C. at 224, 328 S.E. 2d at 270 (emphasis supplied). Because the Commission has concluded that NCNG's rates are just and reasonable and do not result in any unjust or unreasonable discrimination it was not required to examine these proposals. We note, however, the Commission's ORDER does include an extensive discussion of the Cities' "look-through" ratemaking proposal and gives reasons for its rejection. Since we are affirming the Commission's conclusion regarding the reasonableness of the discriminatory rates, we express no opinion on that portion of the Commission's ORDER rejecting the Cities' proposal.

Commission or that the Commission failed to make adequate findings of this question. For that reason the Commission need not consider it on remand.

*State ex rel. Utilities Comm. v. N.C. Textile Manufacturers Assoc., Inc.,* 313 N.C. at 225, 328 S.E. at 270.

In its ORDER on remand, the Commission concluded that Transportation Rates T-1 and T-2 are neither unjust nor unreasonably discriminatory. The Commission found

no justification for a difference between the margins earned on the Company's sales rate schedules and its transportation rate schedules. . . . It is obvious to the Commission that the services performed by NCNG are the same whether service is provided under the sales rate or transportation rate. The gas passes through the same pipes, meters and regulators. The Company provides the same load balancing and use of storage. The same employees perform the billing services. As the services performed by NCNG are the same, common sense dictates that the cost would also be the same. Certainly there is no difference to the customer in the value of service received under the transportation rate schedule from that received under the sales rate schedule.

The Commission also concluded: "The Company's Transportation Rates T-1 and T-2, being based on the margin included in sales Rate Schedules 4, 5 and 6, are not excessive and do not unreasonably discriminate as the applicable sales rates have been found to be just and reasonable and not unreasonably discriminatory."

CUCA maintains that allowing NCNG to earn the same margin of profit for transporting customer owned gas as it earns for transporting gas under a sales contract is unjust and unreasonably discriminatory for two reasons. First, CUCA contends the underlying sales rate schedule is unreasonably discriminatory and unjust. Second, CUCA argues allowing full margin transportation rates is an abuse of NCNG's monopoly power.

We reject both of CUCA's contentions and affirm the Commission's decision. As our earlier decision makes clear, our reason for remanding this issue centered on our concern regarding whether the various customer rate schedules were unreasonably discriminatory. Since the approved margins in transportation

rates track the sales rate margins, a finding that the sales rate schedule is unreasonably discriminatory would necessarily have affected our decision regarding the transportation rates. Having held that the Commission's findings are sufficient to support its conclusion that the approved sales rates do not discriminate unreasonably, our expressed concern regarding the transportation rates is alleviated.

CUCA's second argument is foreclosed by our decision on the first appeal. We concluded in that decision, as noted above, that on this record it was not unlawful to permit the transportation rates to have the same margins as the sales rates.

## IV.

[3]   CUCA argues the Commission erred when it modified and re-approved the IST in that the IST unreasonably discriminates between customer classes in violation of N.C.G.S. § 62-140(a) and results in unjust and unreasonable rates in violation of N.C.G.S. § 62-130(a) and N.C.G.S. § 62-131(a).

For a proper understanding of appellants' argument a brief explanation of how the IST operates is in order. As the Court explained on the first appeal:

> The IST applies to customers presently being served under Rate Schedule Nos. 4, 5, 6 and RE-1 that are capable of using heavy fuel oil as an alternate fuel. The Commission estimated the level of fixed cost recovery NCNG would obtain from these customers by subtracting projected variable costs from the revenues NCNG could expect to receive from IST customers. This calculation was based on anticipated sales and oil prices. The resulting figure is NCNG's allowed profit margin. If oil prices drop so that heavy fuel oil becomes cheaper to use than natural gas forcing NCNG to negotiate lower rates with its IST customers, the IST allows NCNG to add a surcharge to the rates of customers not covered by the IST to maintain its profit margin. If oil prices should increase allowing NCNG to make profits in excess of its allowed profit margin, the excess is passed on to the Non-IST customers by a credit. At the end of each year there is a "true-up."

*State ex rel. Utilities Comm. v. N.C. Textile Manufacturers Assoc., Inc.,* 313 N.C. at 226, 328 S.E. 2d at 271.

Under the Commission's original order, the IST did not include industrial and large commercial customers added to NCNG's system after 30 June 1983. The effect of this exemption was to enable NCNG to earn large profits from any new industrial and large commercial customers while shifting all risk of loss on the non-IST ratepayers who were part of the NCNG system before July 1983. The original version of the IST applied only to customers served under Rate Schedule Nos. 4, 5, 6, and RE-1 which had the capacity to use heavy oil as an alternative fuel rather than all customers having this capacity.

Concerning the original IST formula, we held that excluding new industrial and large commercial customers "from the operation of the IST is unjust and unreasonable as a matter of law." *Id.* at 228, 328 S.E. 2d at 272. We instructed the Commission on remand to include new industrial and large commercial customers in any form of an IST which they might adopt. We further instructed the Commission to consider whether any modified IST adopted "is unreasonably discriminatory and make appropriate findings of fact." *Id.* at 229, 328 S.E. 2d at 273.

On remand, the Commission complied with our directive by modifying the IST "to include as IST customers all customers who have heavy oil as an alternate fuel. . . . The IST will also include new customers in Priorities 2.8 through 9.0 as ordered by the Supreme Court." Additionally, the Commission concluded "the IST affirmed in this proceeding is not unreasonably discriminatory to or within customer classes." In making this conclusion the Commission commented that "whether or not heavy fuel oil is an alternative fuel is a reasonable basis for differentiating among customers, and including or excluding customers in the IST on that basis is not unreasonably discriminatory."

In support of its conclusion, the Commission recited extensive evidence regarding the necessity for a mechanism such as the IST. Illustrative of this evidence was the testimony of NCNG witness Calvin B. Wells. Wells testified:

We are currently in a period of very unstable prices for heavy oil used by large industrial and commercial customers and for natural gas. This situation, together with the fact that our natural gas rates are at or above the cost of fuel oil to several industrial customers, make it impossible to project

with reasonable assurance the volume of natural gas that can be sold under the various industrial rate schedules or the price at which natural gas can be sold to industrial customers at negotiated prices under our Rate Schedule No. S-1. . . . Unfortunately, a modest change in either the cost of oil or natural gas could significantly alter the total sales volume and/or sales mix. Because of the significant impact which this could have on the customers and the Company, we believe it is prudent to adopt a mechanism which provides some protection for both.

With regard to the discrimination issue, the Commission cited the testimony of NCNG's witness Teele. According to Teele:

The IST is not discriminatory because the industrial IST customers get a cap through tariff rates which fix the customers' maximum cost of gas and they also get the benefit of lower gas rates by negotiation when the price of oil decreases. This treatment is generally available only to the industrial IST customers including industrial customers of our municipal customers and not to the residential, commercial and other general service customers. Hence, there is no discrimination in the fact that any excess margin flows back only to the general service customers who are at risk for carrying the company's entire cost of service if the larger IST customers decide to switch to alternate fuel.

Reviewing these persuasive testimonies and the other evidence contained in the whole record, we hold that the Commission's ORDER contains findings sufficient to justify its conclusion that the IST does not unreasonably discriminate between NCNG's customer classes and that these findings are supported by substantial evidence in light of the whole record. The testimonies of NCNG's witnesses Wells and Teele provide substantial support for the conclusion that the availability of heavy oil as alternative fuel is a reasonable basis for differentiating among customers. Moreover, taken as a whole, the record contains additional substantial evidence indicating that the IST facilitates the fixing of just and reasonable rates. While it serves to protect NCNG from losses due to negotiations with customers threatening to switch to heavy oil, it also limits the level of profit the company can make on sales to that segment of customers. The Commission's

conclusion that the modified IST does not violate N.C.G.S. § 62-130(a) or N.C.G.S. § 62-131(a) is not in error.

In conclusion and for the reasons stated, we hold that the Commission did not err in the proceedings on remand. Its ORDER is, therefore,

Affirmed.

Justice MEYER dissenting.

Upon a careful review of the record, I am unconvinced that the Commission's conclusions on the discrimination issue are supported by the findings contained in the Commission's Order on Remand. The Commission has simply enumerated certain purported non-cost factors (some of which are not even discussed in the Commission's Order on Remand), which it says justify the discrimination in the rates it has approved. Even as to those factors which the Commission actually addressed in its Order on Remand, it does not even discuss (much less attempt to justify) the specific *magnitude* of rate disparity it approved. Thus, it is absolutely impossible for this Court to discern the linkage between the factors the Commission considered and the degree or magnitude of the rate discrimination which the Commission approved. While I recognize the difficulty in quantifying precisely how much discrimination is justified by particular factors, the Commission has made no attempt to do so and, indeed, has not even addressed the subject.

While N.C.G.S. § 62-140 allows the Commission to discriminate, it charges the Commission with the responsibility of eliminating *unreasonable* discrimination in the rates of public utilities. It cannot be disputed that the reasonableness of any permitted discrimination is gauged by the relationship between the variances in the conditions of service and the variances in the rates. *See State ex rel. Utilities Comm. v. Mead Corp.*, 238 N.C. 451, 465, 78 S.E. 2d 290, 300 (1953). Rate differentials must be supported by findings (1) that there exists a substantial difference in service or conditions of service and (2) that there exists a reasonable relationship between the degree of the variances in the service and the degree of variances in the rates.

State ex rel. Utilities Comm. v. Carolina Utility Customers Assoc.

As the majority points out, this Court on the first appeal in this case noted that the evidence before the Commission made it clear that there was *substantial* discrimination between the various classes of customers. Our opinion noted that the effect of the rate structure approved by the Commission is that the rates of residential and certain commercial and small industrial customers are subsidized by the remaining industrial, wholesale, and commercial customers. We remanded the case to the Commission so that it could consider the substantial difference between the cost of service and rate of return for various classes of customers and the question of unreasonable discrimination among and within the classes of service. The Commission thus had a duty to review the evidence on discrimination, to enter detailed findings based upon the evidence, and to reach reasoned conclusions on the basis of those findings. N.C.G.S. § 62-79(a). While I believe the Commission attempted to address the issues, I conclude that it has not done so adequately.

When, as here, the rates approved by the Commission deviate so drastically from rates which would be dictated by the cost-of-service studies which are presented in the proceedings, the Commission has a duty not only to explain the reasons therefor, but also to *justify* and *attempt to quantify* the magnitude of the variances dictated by the non-cost factors upon which it relies to justify the rate discrimination it approves.

Because the Commission failed to describe in detail the non-cost factors it employed, failed to explain how each of these non-cost factors justifies discrimination, and failed to quantify (as best it could) the amount of deviation justified by each non-cost factor, this Court is left to guess what precise role each of the non-cost factors listed by the Commission played in the rates the Commission approved.

With full realization of the difficulty which the Commission necessarily encounters each and every time it attempts to justify the discrimination which exists in long-existing rate patterns and schedules, I cannot vote to affirm the Commission's Order on Remand and would vote either to reverse the Commission's order or to remand the case yet another time for further findings and conclusions.