STATE EX REL. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSOC.

[328 N.C. 37 (1991)]

STATE OF NORTH CAROLINA, EX REL. UTILITIES COMMISSION AND PENN-
SYLVANIA AND SOUTHERN GAS COMPANY (NORTH CAROLINA GAS
SERVICE DIVISION) v. CAROLINA UTILITY CUSTOMERS ASSOCIATION,
INC.

No. 338A88

(Filed 10 January 1991)

**1. Gas § 1.1 (NCI3d) — natural gas customers — different rates of return for customer classes not discriminatory**

Findings of fact by the Utilities Commission supported its conclusion that different rates of return adopted for the various classes of customers of a natural gas company do not unreasonably discriminate against industrial customers in violation of N.C.G.S. § 62-140(a).

**Am Jur 2d, Public Utilities §§ 110, 117.**

**2. Gas § 1.1 (NCI3d) — natural gas — transportation rates not unreasonable or discriminatory**

A full profit margin transportation rate schedule which permits a natural gas company to earn the same profit margin for transporting customer owned gas as it would have earned had it sold the gas under its rate schedules is not unjust and unreasonable in violation of N.C.G.S. §§ 62-130(a) and 62-131(a) or unreasonably discriminatory in violation of N.C.G.S. § 62-140.

**Am Jur 2d, Public Utilities §§ 110, 117.**

**3. Gas § 1 (NCI3d) — natural gas — separate industrial rate based on No. 6 fuel oil not required**

The Utilities Commission did not act arbitrarily and capriciously in violation of N.C.G.S. § 62-94(b)(6) in failing to require a natural gas company to establish an additional industrial rate schedule based on the cost of No. 6 fuel oil where, at the time of the hearing, the company had no customers with the capacity to burn No. 6 fuel oil but had one customer in the process of converting its alternate fuel capacity to No. 6 fuel oil, and the company had the ability to make special sales at negotiated prices with any customer who might convert its alternate fuel capacity to No. 6 fuel oil.

**Am Jur 2d, Public Utilities §§ 110, 117.**

STATE ex rel. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSOC.

[328 N.C. 37 (1991)]

APPEAL by Carolina Utility Customers Association, Inc. pursuant to N.C.G.S. § 62-90 and N.C.G.S. § 7A-29(b) from the North Carolina Utilities Commission's Final Order Overruling Exceptions And Affirming Recommended Order entered on 12 January 1988 in Docket Nos. G-3, Sub 141 and G-3, Sub 145. Heard in the Supreme Court 13 December 1988.

*Robert P. Gruber, Executive Director; Antoinette Wike, Chief Counsel, by David T. Drooz, Staff Attorney, for Public Staff— North Carolina Utilities Commission, appellee.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, by James T. Williams, Jr. and R. Marshall Merriman, Jr., for Pennsylvania and Southern Gas Company—North Carolina Gas Service Division, appellee.*

*Jerry B. Fruitt for Carolina Utility Customers Association, Inc., appellant.*

EXUM, Chief Justice.

This is a general rate case which began when Pennsylvania and Southern Gas Company (North Carolina Gas Service Division) ("the Company") filed application with the North Carolina Utilities Commission ("Commission") on 5 May 1987 seeking authority to increase its rates for gas utility service in its service area in North Carolina so as to produce additional annual revenues of $350,000. The application was later amended to reduce the revenue increase to $244,358. The Public Staff responded to the application by stating that the Company's amended application complied with all adjustments proposed by the Public Staff and that the Public Staff had no objection to the increase requested in the amended application. The Company then filed Rate Schedule T (Docket No. G-3, Sub 145), a gas transportation rate schedule, which was consolidated for hearing and determination with its general rate case application (Docket No. G-3, Sub 141). Carolina Utility Customers Association, Inc. ("CUCA") moved and was allowed to intervene. After a hearing in Reidsville on 13 October 1987 before Hearing Examiner Bliss Kite, the Commission issued a Recommended Order allowing the Company the increase sought in its amended application. After oral argument the Commission, on 12 January 1988, adopted the Recommended Order as its Final Order. CUCA appealed.

STATE EX REL. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSOC.

[328 N.C. 37 (1991)]

CUCA has contended throughout this proceeding that the Company's proposed rates are excessive, unjust and unreasonable because (1) the differences in rates of return among the Company's various classes of customers are unreasonably discriminatory in violation of N.C.G.S. § 62-140(a)[1]; (2) Rate Schedule T is unreasonably discriminatory in violation of N.C.G.S. § 62-140(a) and unjust and unreasonable in violation of N.C.G.S. § 62-130(a) and N.C.G.S. § 62-131(a)[2]; and (3) the Company should be required to develop for customers that can use alternatively No. 6 fuel oil a new rate schedule based on the cost of No. 6 fuel oil. The Commission, both in its Recommended Order filed after hearing and its Final Order entered after oral argument, rejected all of CUCA's contentions. We likewise reject them here.

## I.

The evidence before the Commission was largely uncontradicted. It consisted of testimony and exhibits offered by the Company and the Public Staff and testimony of certain officers and agents of various customers which are members of CUCA and which are served by the Company. It tended to show as follows:

The Company, through its North Carolina Gas Service Division, was a duly franchised public utility authorized to provide natural gas utility service in and around Reidsville, North Carolina, to residential, commercial and industrial customers. The Company also sought to provide transportation service for customer-owned gas, *i.e.*, gas purchased by customers directly from suppliers other than the Company but transported by the Company through its distribution system to certain commercial and industrial customers. All of the Company's natural gas supply, including customer-owned gas, came from Transcontinental Gas Pipeline Corporation ("Transco"). The Company has separate retail rate schedules for its various customers. The schedules at issue in this proceeding

---

1. This statute provides that:

   No public utility shall, as to rates or services, make or grant any unreasonable preference or advantage to any person or subject any person to any unreasonable prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to rates or services either as between localities or as between classes of service.

2. These latter statutes require, respectively, that the Commission establish rates which are "just and reasonable" and that any rate demanded or received by any public utility shall be "just and reasonable."

STATE ex rel. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSOC.

[328 N.C. 37 (1991)]

are: Rate Schedule 101—Residential & Multiple Dwelling Service; Rate Schedule 102—Commercial & School Service; Rate Schedule 201—Industrial Service (available to industrial consumers that use less than 50 dekatherms per day and have no alternative fuel capability); Rate Schedule 205—Industrial Service (available to industrial consumers that use between 50 and 300 dekatherms per day and have no alternative fuel capability); Rate Schedule 206—Industrial Service (available to industrial consumers that use between 300 and 3000 dekatherms per day); Rate Schedule 208—Industrial Service (available to industrial customers not covered by any other rate schedule); Rate Schedule 600—Boiler Fuel Service; and Rate Schedule "T"—Transportation Service.[3]

The Company's reasonable original cost rate base was $4,574,930 and its annual operating revenues under its current rates were $9,766,720. Annual revenues under the new rates approved by the Commission would be $10,011,078. The Company should be allowed a rate of return on its original cost rate base of 10.23 percent. Permitting the Company to increase its annual level of gross revenues by $244,358 would permit the Company to earn a 10.23 percent overall rate of return on its rate base.

The Company's customer mix on the basis of annual sales was 56 percent industrial, 28 percent residential, 15 percent commercial, and 1 percent agricultural. Under the rate structure proposed by the Company and approved by the Commission, the price of gas would be increased 12.8 percent for the Company's residential customers and 3.3 percent for the Company's commercial customers. The price of gas for all of the Company's industrial customers, which are represented by CUCA, would be decreased. The decreases would range from 2.0 percent for industrial customers in Schedule 201 to 4.4 percent for industrial customers in Schedule 600.

Rate Schedule T proposed by the Company and approved by the Commission was a "full margin" transportation rate based on the applicable rate schedule on which the customer would buy

---

3. The Company may choose to offer interruptible transportation service under this rate schedule to large commercial or industrial customers who are presently connected to its system, have qualified for service on Rate Schedule 205, 206, 208 or 600, have obtained an independent supply of natural gas, have made arrangements to have the gas delivered by Transco to one of the Company's existing delivery points, and have executed a contract with the Company.

STATE ex rel. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSOC.

[328 N.C. 37 (1991)]

the natural gas from the Company under its regular sales rate schedules. Under Rate Schedule T the Company earns the same profit margin on the gas transported as it would have earned had it sold the gas itself.

All of the foregoing were found as facts by the Commission in support of its order that the Company be authorized to increase its rates in order to produce $244,358 in additional annual gross revenues.

## II.

[1] CUCA first argues that the rate schedules approved by the Commission are unreasonably discriminatory in violation of N.C.G.S. § 62-140(a) because there are no findings in the record to support the differences in rates of return among the Company's various classes of customers permitted by the Commission's order. The Company's rates of return among its various classes of customers are figured by first determining the operating revenues, the cost of service and the rate base allocable to each class. The allocable cost of service is subtracted from the operating revenues and the difference is divided by the rate base to arrive at the rate of return for that class. The mathematics are simple. The difficulty lies in the allocations of cost of service and rate base among the various customer classes.

Here Public Staff witness Davis testified to four different methodologies used in allocating costs, including rate base. Each methodology produced somewhat different rates of return among the customer classes. All methodologies, however, resulted in substantially higher rates of return for the industrial classes of customers than for the residential, and, to a lesser extent, the commercial classes. Depending on the methodology used, the rates of return for residential customers ranged from a high of 4.16 percent to a low of 1.78 percent. The rates of return for industrial schedule No. 205 ranged from 37.24 percent to 28.6 percent.

Because of these substantial differences in rates of return based essentially on cost of service, CUCA argues that the overall rate design permitted by the Commission unreasonably discriminates among customer classes. CUCA argues the Commission failed adequately to address this issue in its findings and conclusions; therefore the Commission's order fails to justify the differences in rates of return permitted. CUCA argues, further, that the Commission,

STATE EX REL. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSOC.

[328 N.C. 37 (1991)]

as a matter of law, should be required to adopt a specific methodology for the allocation of costs of service and to require the Company to use a rate design under which the rates of return among customer classes would not deviate more than 10 percent, plus or minus, from the total rate of return permitted to the Company, which in this case was 10.23 percent.[4]

CUCA's arguments here were made and rejected in *State ex rel. Utilities Commission v. Carolina Utility Customers Association*, 323 N.C. 238, 372 S.E.2d 692 (1988) (hereinafter *CUCA I*). In *CUCA I* the differences in the rates of return among the utility's various customers were even greater than they are here under the rate design approved by the Commission. We affirmed the Commission's order in *CUCA I*.[5] The Commission concluded in *CUCA I* that it would be unjust and unreasonable to establish a rate design in which rates for each customer class were based solely on the cost of service to that class and which would result in approximately equal rates of return for all customer classes. The Commission based this conclusion upon findings and evidence which demonstrated the following: All of the rate increase approved was borne by residential, commercial and small industrial customers of the utility; its industrial customers' rates were not increased at all. To equalize the rates of return among customer classes would result in a 32 percent rate increase to residential customers. Cost of service studies upon which rates of return are figured are, themselves, subjective and judgmental insofar as they try to allocate costs among classes; therefore, they should not be controlling in the establishment of a rate design but should be con-

---

4. The overall rate of return is a percentage which the Commission concludes the Company should be permitted to earn on its rate base, which is the cost of the utility's property used and useful in providing service to the public. See N.C.G.S. §§ 62-133(b)(1) and (2). The rate of return percentage is calculated by subtracting from the Company's revenues its cost of service and dividing the difference by the rate base.

5. Initially in *CUCA I* this Court concluded that the Commission had not adequately addressed the differences in rates of return among the utility's customer classes in its order, and we remanded with instructions to the Commission to "consider this issue and make appropriate findings." *State ex rel. Utilities Commission v. N.C. Textile Manufacturer's Association, Inc.*, 313 N.C. 215, 223, 328 S.E.2d 264, 260-70 (1985). On remand the Commission reaffirmed its previously established rates but made additional findings seeking to justify its approval of the disparate rates of return. On the second appeal in *CUCA I*, as discussed in the text, this Court concluded that the Commission adequately addressed this issue and that its findings and conclusions justified its order approving the rate design.

STATE EX REL. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSOC.

[328 N.C. 37 (1991)]

sidered as only one among other factors. The other factors to be considered include "competitive conditions, consumption characteristics of the several classes and the value of service to each class, which is indicated to some extent by the cost of alternative fuels available." *Utilities Commission v. City of Durham*, 282 N.C. 308, 314-15, 193 S.E.2d 95, 100 (1972). In *CUCA I* the Commission found that most of the utility's industrial customers had capacity to switch to alternative fuels and were able to negotiate lower prices with the utility by threatening to switch to these alternative fuels. These customers thus had bargaining power unavailable to residential and small commercial customers and the risk inherent in serving these industrials was higher than the risk inherent in serving residential and commercial customers.

Likewise in the case before us the Commission gave detailed consideration to the disparate rates of return permitted. The Commission found as follows: The entire brunt of the rate increase permitted was borne by the Company's residential and commercial customers and "any further increase in the residential market would be inappropriate at this time."[6] Cost of service studies presented were not "objective in nature, but rather reflect the preparer's judgment as to how to fairly allocate common costs among customer classes, as well as being based on numerous assumptions." These studies should be considered an "important and relevant guide" in designing rates but should not necessarily be determinative. Rates of return for residentials who cannot switch to alternative fuels should not be compared to rates of return for industrials who can switch to alternative fuels. The Company's risk of maintaining its profit margin "is significantly less" on its residential service than on its service to large industrial customers. "Such risk is further magnified" here because of the Company's customer mix, which is 28 percent residential, 15 percent commercial, one percent agricultural, and "a substantial industrial market of 56 percent."

Ultimately the Commission concluded, based on the foregoing findings, "that the rate design approved in this proceeding does not unreasonably discriminate against the industrial customers after weighing and balancing all of the relevant factors discussed herein."

---

6. In support of this finding the Commission specifically referred to Public Staff witness Davis's testimony that this was the only gas rate case in recent years in which the residential customer received an increase as great as 12.8 percent.

STATE EX REL. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSOC.

[328 N.C. 37 (1991)]

We hold that under *CUCA I* this conclusion, being fully supported by the Commission's findings,[7] should not be disturbed on appeal.

### III.

[2] CUCA next contends that Rate Schedule T approved by the Commission is unjust and unreasonable in violation of N.C.G.S. §§ 62-130(a), -131(a), and unreasonably discriminatory in violation of N.C.G.S. § 62-140.

The Commission approved Rate Schedule T, which it defined in its Order as a schedule "for service to interruptible industrial customers who wished to transport natural gas for [qualified] uses [as] a full margin transportation rate based on the applicable rate schedule on which the customer would buy natural gas if the customer had been on a regular sales rate schedule." Rate Schedule T is a service sought to be provided by the Company to certain of its industrial customers who buy gas on the so-called "spot" market at prices below the Company's prices. If permitted the Company would transport this gas to its customers under Rate Schedule T. It would be entitled to earn under this schedule the same profit margin on the gas transported as it would have earned had it sold the gas under its regular sales rate schedules.

CUCA argues: (1) The regular sales rate schedules are unreasonably discriminatory; therefore Rate Schedule T, being based on the regular sales rate profit margins, must also be unreasonably discriminatory. (2) While the Company is authorized under Rate Schedule 1000 to negotiate transportation rates, its customers have no other alternative except the Company for transporting gas they purchase. There is, therefore, no real basis on which the customers can fairly negotiate a transportation rate, and the "full margin"

---

7. The conclusion and findings to which we refer are actually contained ·in a portion of the Commission's Order captioned "EVIDENCE AND CONCLUSIONS FOR FINDINGS OF FACT NOS. 10-13." Finding No. 13 is that "The rates proposed by the Company in its amended application will produce the additional gross revenues necessary to provide the rate of return approved herein and are the appropriate rates in this proceeding." That the rates are "appropriate" is, of course, a conclusion of law, not a finding. We have in several cases noted this tendency of the Commission to mix its findings and conclusions in those portions of its Orders denominated "Findings of Fact" and "Evidence and Conclusions For Findings of Fact." This practice makes both appellate review and understanding of the Commission's Orders more difficult, but we have not overturned Orders on this basis so long as the Commission's chain of reasoning in arriving at its ultimate conclusions is appropriate. *See CUCA I,* 323 N.C. at 246, n.6, 372 S.E.2d at 697, n.6.

STATE EX REL. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSOC.

[328 N.C. 37 (1991)]

rate permitted by the Commission allows the Company to abuse the monopoly it has with regard to transporting gas. (3) The full margin transportation rate approved by the Commission requires customers to pay certain costs associated with procuring a gas supply which the Company does not incur when it simply transports gas sold by others. These costs, argues CUCA, include pipeline demand charges, storage cost and "peaking" cost. Indeed, argues CUCA, the full profit margin transportation rate may actually require customers to pay twice for certain services, first to the Company and second to Transco which transports the gas to the Company's distribution system.

On the record before us, we must reject each of these arguments. We have already concluded that the Commission's findings are sufficient to support its conclusion that the Company's regular sales rate schedules do not unreasonably discriminate among its customers. It must follow that the Commission's findings are sufficient to support its conclusion that Rate Schedule T is not unreasonably discriminatory insofar as it is based on the full profit margins provided by the regular sales rate schedules. *State ex rel. Utilities v. Carolina Utility Customers Association*, 323 N.C. 238, 372 S.E.2d 692.

With regard to nonnegotiability of Rate Schedule T, the double payment of certain costs and the payment of cost which the Company does not incur, there is no evidence in the record to support these factual contentions on the part of CUCA. The evidence on negotiability is contrary to CUCA's contentions.[8] The Company is not required by law to furnish a transportation service and, as we understand the record, has not in the past done so. It seeks in these proceedings to provide its customers with an additional nonessential service which they may or may not utilize. In lieu of using the Company's regular sales rate schedules, a customer may find it possible to save money by buying "spot market" gas and using the Company's negotiable full profit margin Rate Schedule T. If no such saving is possible, the customer can use the Company's regular sales rate schedules. Given that this choice remains the customer's and in no event is the customer required to pay more for the Company's services than the regular sales rate schedules require, it is difficult to see how Rate Schedule T, even if negotiable

---

8. The only testimony on the subject of negotiability of Rate Schedule T was from one of CUCA's witnesses who said he would negotiate this rate.

STATE EX REL. UTILITIES COMM. v. CAROLINA UTILITY CUST. ASSOC.

[328 N.C. 37 (1991)]

in the Company's discretion, can amount to an abuse of the Company's monopoly position.

Ultimately these aspects of CUCA's argument resolve themselves into its contention that transportation rates, like regular sales rate schedules, should be based entirely on the cost to the Company of providing the transportation service. Both the Commission and this Court have consistently rejected the notion that cost of service should be the sole factor in determining rates or rate designs, whether the rates are for the sale of gas or the transportation of gas. *Id.; State ex rel. Utilities Commission v. N.C. Textile Manufacturers Association, Inc.,* 313 N.C. 215, 328 S.E.2d 264 (1985); *Utilities Commission v. City of Durham,* 282 N.C. 308, 193 S.E.2d 95 (1972).

IV.

[3] Finally, CUCA contends that the Commission acted arbitrarily and capriciously in violation of N.C.G.S. § 62-94(b)(6) in failing to order an additional industrial rate schedule based on the cost of No. 6 fuel oil. Rate Schedule 600 was approved by the Commission as the Company's only boiler fuel service rate. Gas prices under Rate Schedule 600 were based upon the weighted average of the cost of No. 2 and No. 4 fuel oils. Apparently No. 6 fuel oil is cheaper than either No. 2 or No. 4 fuel oil.

Evidence on this issue was that at the time of the hearings the Company had no customers who had the capacity to burn No. 6 fuel oil. One customer testified that it was in the process of converting its alternate fuel capacity to No. 6 fuel oil. The Company offers special sales under negotiated rates. Its evidence tended to show that it would be willing to negotiate special sales with any customer who might convert its alternate fuel capacity to No. 6 fuel oil on a case-by-case basis.

Upon this evidence the Commission found that "the Company has very little and possibly no need at all for . . . a rate schedule comparable to No. 6 fuel oil . . . . The Company presently has the ability to make special sales at negotiated prices according to the terms and conditions of its Rate Schedule 1000. . . ." Upon these findings the Commission concluded that the Company "should not be required to establish a separate rate schedule comparable to No. 6 fuel oil at this time."

SHADKHOO v. SHILO EAST FARMS

[328 N.C. 47 (1991)]

We hold that the Commission did not act arbitrarily and capriciously in violation of N.C.G.S. § 62-94(b)(6) in refusing to require the Company to establish a separate schedule based on the cost of No. 6 fuel oil. Whether to have such a rate schedule was, on this record, a matter for the sound regulatory judgment of the Commission. There was evidence in the record to support its findings on this question; and its conclusion was, in turn, supported by those findings. There is no legal error in this aspect of the Commission's order.

For the reasons given the order of the Commission is, in all respects,

Affirmed.